Austin. Stevenson. All right. Good afternoon, your honors, Arthur Jarrett, James Jarrett and Schwartz, your honor, Judge McKee. It's always good to see you again. I have to report to you, as I have reported to you in the past, that my Crohn's disease has flared up and I was hoping to be on in the morning. I do have PICC lines that I have to connect and medication. I will be as coherent and as attentive as I can be. Once I hook up to a deep pump, I will be hooked up to my feeding source, which is an IV bag and pump. I don't know that that would be conducive or fair to your honors. Well, if I were you, it's okay, at least for myself, it's fine, but if that's what would make it more effective, what would you like to say? Oh, no. Just standing will keep me functioning. Okay. You don't want us to take the last case and then come back to you? That wouldn't help you? It wouldn't matter at this point. I do want to say I did notify the clerk at the beginning of the day that this was an issue. I apologize. You should have taken it first. I apologize. It happens, and you've always been wonderful about it, so I have. It does a good thing for me. It really focuses why I'm here, at least, because I don't have the freedom of the amount of time I would like to present. Again, I narrow myself to where I think I belong, and having argued so many civil rights cases before your honors, your honor especially, and the last was Bibby v. Coca-Cola, the thing that has always been the issue, and I say the thing, the thing that always comes down to, will this case get to trial? Are we at summary judgment and the case is over, or will this case get to trial, is this magical word called threshold, the threshold. The threshold is, has plaintiff presented enough of a case to allow the trial judge in good faith to allow the case to go forward, and the threshold has acted as a gatekeeper in keeping throngs of employment cases from clogging the course in a good way, but in a bad sense, in all the cases I've done, I can't define threshold. For some cases, it's very case-specific. Well, this was... But why is it just a genuine issue of material fact? Well, if it were just a genuine issue of material fact, which it should be, and all the material facts are an issue, and in contest, and there are sufficient numbers of them, at least ten, then I believe that a jury should have the right to decide the credibility, the content, and consequence of those acts or claims of action. But in this case, it seems like, was there any evidence that those who decided to separate or terminate Ms. Stevenson from PPS actually knew that she had filed the September 2000 complaint? Well, if you take that she's terminated constructively in 2002, and she claims for every year between her employment, during her employment, for at least three to four times a week in her contact with both Captain Law and Warden Adams, she was sexually harassed, that the filing of the EEOC report in 2000 would give you ten more years of harassment. But the person who did the terminating here, wasn't that Zelda at Richmond? Well, the person who did the terminating, I would argue, was constructively my client. But that person, she sent several warning letters to Ms. Stevenson, and she never received them. That was about the FMLA, sending warning letters saying your doctor has not sent the materials. But did she get a response back? What our client did was notify her doctor every time saying, please send these forms in. You have marked me unfit for work due to emotional stress, due to the environment. You need to send the forms in. The doctor did not. And the doctor did not. Now, do we say this? In the meantime, though, they did give her a temporary FMLA leave, didn't they? And if they were bent on retaliation, why in the world, and you can argue that's a jury question, but why in the world would they give her a temporary FMLA leave rather than seizing the opportunity to get rid of this woman? I think that's brilliant. If you're HR and you're not involved in harassing her, if you are part of the remedy team, I want to get her out as soon as I can, because if I can't control the warden, and I can't control the captain, then what I have to do is get rid of the person who these two are targeting, have been targeting, will continue to target, and God knows what would happen next. Get rid of her. Get rid of her FMLA, put her out of workers' comp. She hasn't been injured by anyone, but anything to get her out, because otherwise, we don't know what could happen next. We have the Betty Boop pen, which people laugh at. My mother was a chorus dancer in the 20s, and Betty Boop was synonymous with, that we see it on the subway today, the forced trafficking of women into prostitution. And my mother looks at that. But that was another era. Today, how do people perceive receiving? Well, I guess if a woman were pictured that way, it would be considered over the line for the workplace. Barely showing anything but breasts, barely showing anything but the next inch up to underwear, and the only purpose of the subject itself is not to remind you of any movie. Can anyone name a Betty Boop movie? No, it's to remind you of the sexual connotation that the dance girls in the halls during depression, immigrant girls had, and they were known as Betty Boop girls. My mom was a Betty Boop girl. She was a chorus dancer. So when you bring back a pen from Florida, and everybody's getting gifts, and your captain says to you, you know, I got everybody something that reminds me of what they are to me. This gift was from where? Florida. Where from in Florida? I don't remember what town. It wasn't Betty Boop, Florida. I know that. But I know if I were her husband or her child, I would have been offended and thrown the pen back at him. Counsel, can I go back to one question that you went at, but I didn't get the whole answer. When she was terminated for not giving the medical information, her doctor not providing it, you said every time you got a request, you immediately wrote to the doctor and said, you know, you or her, somebody did, wrote to the doctor and said, here, we need this information, get it for us. Was the employer ever advised that, look, we're trying to get this information, we're just having trouble with our doctors, bear with us? To my knowledge, yes, that was one of the first contacts made by the plaintiff was that she had sent everything to her doctor to be signed and was attempting to get the doctor to respond. Now, whether it's her responsibility to do that, I just like to note, and I don't, I hope we don't harbor on the, spend a lot of time on the FMLA, but it's interesting that the FMLA, the case is coming down, put on the employer the total responsibility for explaining rules, whether rules are explained or not, does the person's conduct fit the FMLA? It's been away from format and totally on the substance of the behavior. Here we have somebody who actually was suffering from insomnia, migraines, depression. She was trying to become a lieutenant, a female in a fully, let's look at the environment. This is not the police department. But it is, but the question is relevant because if the person terminated her because of a failure after numerous opportunities to at least respond and say what the status was, then it might not be, or there's a good argument that it wasn't as a result of some sort of retaliation or for having filed previously a complaint in September of 2000. So it all ties in. And well, if it all ties in, then we can't get past the initial actions of these people, whether they actually have an additional charge. I was just going to say was that she had spent years complaining going up and down the line about the dangerous environment created when you're in a male population of criminals, when nobody carries weapons, they carry pepper spray, and the only safety you have is the then it seems to me that that person, that woman is in great danger because no offender, no rapist is going to really care too much about the safety of Sergeant Latanya. The person she was afraid of was a woman, another woman officer, not the, not the, the woman officer who she had no information going into was Officer Burnett, who blew up. She went to get support from the warden and what did Burnett do? Assaulted both the Sergeant and then knocked down from Lieutenant to corrections officer for her allowing inmates to be beaten. She was a problem. When she, she being a client, not she being Burnett, that was demoted because she was well before that, but our client didn't know that Sergeant Stevenson, the plaintiff went to the captain and the warden and they laughed it off when Sergeant Stevenson saw that her emergency contact card was the only card of everybody that had the actual full contact information where she could be found. It's not a far jump in our society, in our current prison system to say that either Corrections Officer Burnett or Corrections Officer Burnett in concert with any referral made by any one of the inmates could not do harm to the plaintiff and regardless of her name being in that emergency contact in full with address and phone number, nobody else and even when asked could she remove it, inexplicably she could not remove it. You've got an atmosphere where the inmates know that this person is on the outside, outside of the guard. This person is a good target because nobody's going to care as much. I'm not going to suffer as much if I do something. That's the danger. Now that's a danger that's specific to this place, but you have a career Corrections Officer here who deserved the right to become Lieutenant and because we all know what men can be like and men in male-dominated systems, I ask and I come back to that word threshold and say let's just use our common sense. Nobody runs away from promoting themselves to Lieutenant unless they feel they're lost in a system where they could be killed. She may feel that way, but we're trying to also tie that to a Title VII claim. Well in a Title VII form, would a reasonable person in her position where she's pervasively sexually harassed by the very people who she'd have to complain to, the very people who the Supreme Court found pervasive. You've got the Betty Boop incident, the incident of how you look good in street clothes. We've got three to four incidents per week that she stated that she would hear, comments were made. But over the course of 10 years, I mean I see about nine that are alleged. One was in 91, then you have 97. Well that's the threshold question. Do you dismiss the daily routine, what becomes routine harassment? And I say that that is more invidious than the individual incidents. Well you're right, that's on the record. The daily, you're probably right, the daily mindset that she's subjected to. That creates the culture. That creates the culture. That's the whole purpose of Title VII. But where's the evidence here in the record? Where? The daily. The daily culture. She has all these things come up. I'm sorry. Other than in her argument, her statement, where is the evidence? I didn't see it in the brief. Evidence in terms of? That she has to undergo that kind of psychological torture three to four times a day. She had stated that in her deposition and I don't want to waste your time. I mean for example, we have, I mean I can't think of the name of the case, but I had a, I was sitting on a panel a few years ago with then Judge Alito. There was a woman in the post office and she was, there were comments several times a week that were clearly creating a hostile environment, or appeared to be. And as I recall, we reversed and I think that wrote the opinion and says, you know, that gets you to a jury. But where do you have that evidence here? She, she did state it during, I wish I could point it out. Well again, maybe, maybe on rebuttal you can, you can do that. They're in a 28-J letter, if you want to send it to us. Yeah, I'm sorry, you're on. If you want to send it to us. You're on a 28-J letter. Send it to us. We have more time to think about it and figure it out. I end with just one point. We're going to become, coming to a point of a, I think it's a Terry versus Ohio bright line kind of test for what will be acceptable and unacceptable behavior that will address the issue of threshold. I think those decisions are going to have to be made by the people who are victims of those offenses, as well as the courts and the legislature. And it's hard for us as poor males here to really understand what it's like to be a woman and go through what this person has gone through or know what the word Betty Boop means to someone like my mother. And I will send the letter to you to get that extra information. Thank you. And I thank you for your understanding. And it's a pleasure to meet you, Your Honor. And a pleasure to see you again. Thank you. Did you say rebuttal? No, I can't recall. I don't. May it please the court, Eleanor Ewing, representing the City of Philadelphia. During Mr. Jarrett's argument, I think the court hit the nail on the head with the notion that yes, there is a threshold and the evidence in this particular case does not cross that threshold. The evidence is not in the record. There are descriptions, there are generalizations in the brief that is filed by Ms. Stevenson. They talk about things like she was constantly degraded, she was subject to disgusting behavior, but Ms. Stevenson was deposed. She was asked over and over again, what acts were you subjected to? Where was the discrimination? And she described in all, I believe it was nine different things. Two of those were comments. One was she said that in 1996, I think, shortly after she started working for the people that she is accusing, she said they said, if you play your cards right, you could go far here. If the second, the other comment was supposedly she, when she went to, there was a policy that said that everybody who worked in a particular facility, like a halfway kind of house facility, wore street clothes and not their prison uniforms. And she heard someone say the next day, the captain said he heard he looked pretty good. Now that's the sum total in the record of the comments that were directed towards Ms. Stevenson, at least that the district court judge had to deal with. And these do not stack up in any way, shape, or form to the type of behavior that is in the hostile work environment cases that have been, you know, successful that the cases. Well, don't look at the comments. Look at some of the conduct to look at the, the Betty Boop pen. She feels that she has, in fact, now that she feels he has no backup, she has no backup. She calls for a backup. Nobody shows. Well, the backup your honor occurred in 1991. She testified to that before she became in ASD or worked with any of these people or was a sergeant, but, and, and Betty Boop. And not only were there five, we all know there are five elements to a hostile work environment case and there have to be intentional acts because of gender, they have to be severe and pervasive acts. And there is both an object of harm requirement and subject of harm requirement. Now I heard Mr. Jarrett talk about his mother's reaction to Betty Boop. The record, again, the testimony in the record is that Warden Adams in this instance, who was her boss's boss, went to Florida, went to Disney World, went on vacation and he brought back for every one of the people who worked for him a pen and he went to Disney World. So he brought back a pen with a cartoon character. Were these purchased at Disney World? I believe they were. I believe the record says that your honor. And so he brought back Mickey Mouse. He brought back Dumbo. He brought back Minnie Mouse. He gave them out to the men. He gave them out to, I guess, Ms. Stevenson was the only sergeant, female sergeant, because there was another female sergeant during this entire period of whom we don't hear anything. We don't, we don't know anything about her other than that she existed and worked, I guess, on another shift. But I, we would submit your honor that, that objectively that a reasonable person in that situation who is getting a character cartoon pen as a souvenir gift from their head supervisor would not think that this was a degrading and humiliating thing. I mean, I don't know. In the real world, though, he gives a woman a pity boo pen. Basically, it's T and A. And how else, this is 2001, how else could that be interpreted? It's not, well, I want you to work on your penmanship. And I love the flow of ink in this little pen. And by the way, the character that's on that pen just happens to have ample breast and an ample butt, but you look past that and work on your penmanship. How else would you interpret that? Well, we don't really know what the, what the pen looked like. We don't have a picture of it. Your honor, I was in, I was in the post office. It was the pen in evidence? No, I was in the post office literally yesterday. I was standing in line behind a woman and knowing I had this argument coming up and this woman about, you know, 60 years old standing in line with her packages and she has a little plastic tote bag she's literally carrying and on it is Betty Boop. And, you know, and I said, oh, that's interesting. I have this argument tomorrow about Betty Boop. But I don't, I think that this is not something that necessarily a reasonable person By itself, it doesn't get to the threshold. But why isn't that at least something the jury should look at? And the jury making, well, yes, a cartoon character is no big deal. Well, the jury could look at it and say, what boss in his right mind would give a woman in this day and age a pen featuring a cartoon character with prominent breast and a prominent butt unless you're trying to convey something to the person you're giving the pen to other than I missed you and I thought about you and I brought something back for you as an employee. Yeah, the standard is not though whether you have the most sensitive boss in the world or whether the boss is, you know, should have thought I should get everybody Mickey Mouse or, you know, or Donald Duck or so, or I shouldn't have brought them a present at all because I'd be a lot safer. One of the elements is that even if we would say that Betty Boop universally would offend every woman and would offend that woman in front of me at the post office, that one event, unless it is the most extreme thing in the world, is still not enough for a hostile work environment. It's still not enough to get to the jury. The cases that have gotten to the jury in this court have been ones where people, their bosses are propositions. They're, they're leaving pornography in their desk drawers. They're hanging it on the walls. I mean, these are, you know, it's, this is a case that is, is, just does not have the evidence at all when you compare it to those cases where the conduct was indeed severe and pervasive and there was no doubt that it was gender related. When I said about the policy, you mentioned in brief that there's a policy in place to deal with gender discrimination and you rely upon that policy in terms of Alrath and whether or not that affords you a defense. Does, who does the, who do you point to under that policy when you, when you're forced with something, faced with something that you believe is an act of discrimination, gender discrimination? There is an EEO officer, typically a female one. I think in this, in the record here, we see that when Ms. Stevenson says that she complained to the EEO officer and a female about Lieutenant Burnett, I'm sorry, Officer Burnett, the female guard, not being immediately suspended. And the EEO officer is in the prison? Yes. Does she report to the warden? I believe that that, that is a separate line of authority so that it is, you know, separate and apart from the, the line, the line officers. This is obviously about my question. Showed by situation where the person who's the alleged perpetrator of this is the warden inside of an institution like a jail. Well, very little of this has to do with the warden. The case really has to do with Captain Lawton. The warden, in fact, when we get to the Lieutenant, to the Officer Burnett incident, the warden and Captain Lawton are standing together. And Ms. Stevenson comes in and apparently, again, I'm talking about not the most sensitive boss in the world award. Captain Lawton thinks it's a joke. And he says, you know, you're not serious about this, are you? And so, you know, Ms. Stevenson is obviously upset. She is serious. So Captain, so Warden Adams, when he realizes this, he stops acting like it's a joke and he says, go and file a complaint. And she does. Ms. Stevenson goes, she does, files, writes out a complaint and disciplinary proceedings commence. So he does the right thing. He is not somebody who is, there are no comments that are, there are no quotations anywhere in the record that are attributed to Warden Adams in terms of demeaning or humiliating Ms. Stevenson. He does the right thing here. And the person that she really has the problem with is Captain Lawton. But disciplinary proceedings occur. There is a panel convened. They take testimony. They, the sergeant who was her partner that day, the male sergeant, he testifies. She does not testify. She does not show up. And they go out and they deliberate and they come back and they find that the complaint is not sustained. And the sergeant, when he testifies on his deposition, he believes that it was not sustained because she didn't come. What does the record show as to when anyone at PPS learned that Ms. Stevenson had filed a discrimination complaint in September 2000? There is nothing in the record, Judge Ambrose. In fact, the complaint itself is not in the record. We know that it was filed in September 2000 because... I was saying, but who at PPS learned of it, do you know? There's nothing in the record that indicates when anyone learned of this 2000, when we look at those nine events that are in the record, that there are, I think, three of them that occurred after that date relevant to her retaliation claim, one being the officer Burnett, one being the separation. And I think she claims that there was an incident where she went, was required to work when she had pinkeye. But in her complaint, that she, to commence the lawsuit, she actually says that happened about six or eight months prior to the EEO complaint. Well, you still have some more time. We didn't go for the questions. Okay. I guess the only thing I wanted to point out, the last thing would be that the separation is completely documented in the record. The letters sent by the city, there's testimony of Ms. Stevenson as to getting the forms from the... I've asked your opposing counsel about that. Right. I think we're pretty clear on that one. Right. And I would point to, I looked up in page A136 of the record, I would just point the court to where there's a question, after receiving this February 7th letter, did you contact the city with respect to the termination of your family medical leave? Answer, no. I actually went to my doctor to get the papers and she told me that she didn't have them. Okay. So you did not submit the paperwork even after this date? No. I received another letter stating that I was terminated. What the city was faced with was an employee who stopped working after January 1st of 2002, and as of the end of February, had not been to work and had not communicated any intentions and had not sent in any paperwork. And there's a case in this district and there's a case in the Fifth Circuit that both would indicate that the revocation of family medical leave at that point was, is merited as a matter of law. Thank you. Okay. Thank you very much. Fine. We'll take an item of advisement from the county counsel for your argument. Thank you, Your Honor. Thank you. The next matter is Musick v.